Upon review of the competent evidence of record in accordance with the directives of the Court of Appeals the Full Commission modifies its prior holding and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and employer-defendant.
3. Electric Insurance Company is the carrier on risk.
4. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
5. Industrial Commission forms and filings relative to this case were stipulated into evidence as Stipulated Exhibit 2.
 * * * * * * * * * * *
Based upon all the competent and credible evidence adduced from the record and in accordance with the directives of the Court of Appeals, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the first review of this matter by the Full Commission, plaintiff was 63 years old and was a high school graduate. Plaintiff began work with defendant-employer in March 1979 as a utility operator. His duties included working as a polisher on channels and working in the powder and sandblaster sections.
2. Defendant-employer made components and pellets for nuclear energy. They also made aircraft parts. Plaintiff worked in the nuclear plant section for approximately eleven years. He then went to work in the aircraft section for ten or eleven additional years. His duties in the aircraft section included shipping and receiving, driving the forklift, and working in the forging and chip areas. In October 1999, plaintiff's duties mainly consisted of gathering components together to make an engine kit to ship to Ohio.
3. On 26 October 1999 after finishing his normal job duties, plaintiff helped other employees pack laptop computers in a box. Plaintiff remarked that it was unusual to be packing laptop computers for surplus. At the end of his shift, the packed boxes containing the computers had been put to the side for pickup on the next day. The area in which the work was performed was open and accessible to anyone in the plant.
4. On 28 October 1999, Andrea Hughes, human resources manager and Todd Best, compliance and integrity manager, summoned plaintiff to a meeting with them. A security guard was also present. Plaintiff was escorted to the meeting in a conference room by his supervisor, Ron Judge. Plaintiff had no idea why he was being called to a meeting, but he thought he was being sought out for receipt of an award. Upon arrival at the meeting, Ms. Hughes told plaintiff that some of the laptop computers were missing from the shipment the day before. Plaintiff assured Ms. Hughes that he did not have anything to do with the missing laptop computers. Plaintiff was asked a number of questions by Andrea Hughes and was then sent by security escort downstairs to another room. After waiting in the downstairs room for about 45 minutes, plaintiff was escorted by a security guard back to meeting room with Andrea Hughes and Todd Best. Ms. Hughes had interviewed the other employees who had helped pack the computers. Ms. Hughes told plaintiff that none of the employee stories matched. At that point she advised plaintiff that because of the theft of the notebook computers she was placing him on "crisis suspension." Plaintiff testified that he had never been through anything like that before; that his integrity was being questioned and, "I went completely bazonk. I just couldn't even think." The security guard escorted plaintiff to his locker, where he was directed to retrieve his belongings. Plaintiff's employee identification badge was taken and he was escorted through the plant where other workers were watching to the parking lot. In the parking lot, the security guard scraped the parking sticker from plaintiff's truck and directed him to leave the premises immediately. Plaintiff was extremely surprised and upset that he had been accused of stealing and abruptly suspended. Plaintiff testified, "I was just all to pieces." Plaintiff's wife, Martha Bursell, testified that plaintiff was so devastated that it was like "a torpedo had hit him."
5. During the following week, plaintiff was requested to return to work. He was given back his identification badge and parking sticker. He met with Dwight Thomas, his manager, and Ms. Hughes and was placed on "decision-making leave." Plaintiff was advised that he was placed on "crisis suspension" because he was observed away from his work area and in the parking lot without permission on 26 October 1999. Plaintiff had been given permission to go to his vehicle during breaks. He was further cited for failing to secure property under his control.
6. When plaintiff returned to work, many employees asked plaintiff about what had happened. He was harassed and called, "Thief." People were constantly pointing at plaintiff. Plaintiff became nervous, panicky and paranoid and he had difficulty sleeping. Plaintiff appealed the decision-making leave to a peer review committee. At the review hearing, plaintiff was "visibly shaking."
7. Plaintiff subsequently received a letter from the peer review committee issuing him a written reminder of the rules regarding breaks away from the workstation. Defendant-employer did not find any evidence that plaintiff had stolen anything.
8. Even after the appeal was over, plaintiff could not sleep at night and continued feeling paranoid. He began having panic attacks. He asked for help through the employee assistance program (EAP), which referred him to Dr. Koff, a clinical psychologist. Dr. Koff diagnosed plaintiff with adjustment disorder with mixed features. Dr. Koff testified that, but for the October 1999 incident, plaintiff most likely would not have developed his condition.
9. When plaintiff's condition did not improve after seeing Dr. Koff, he sought treatment with Dr. Robert H. Weinstein, a psychiatrist, who diagnosed him with major depression with obsessions and prescribed Prozac. Dr. Weinstein treated plaintiff with supportive therapy and medicines such as antidepressants, sleeping pills, and atypical antipsychotics. Dr. Weinstein opined that the incident at work where plaintiff was accused of stealing computers was a significant causal factor in the development of plaintiff's mental condition for which he provided treatment. He further that opined that the shame, humiliation and abandonment plaintiff experienced led to the development of his major depression with obsessions. Dr. Weinstein testified, "Anytime you have a surprise humiliating experience, it can lead to psychiatric sequelae. It depends on the individual. It will always have some impact; what kind of impact is up to the individual." Dr. Weinstein was of the opinion that the events in plaintiff's employment on October 28, 1999 were unusual for plaintiff, unexpected by him and but for the accusation of stealing by the Human Resource Director, he is not aware of any reason plaintiff might have developed his symptoms. He opined that the calls and taunting from other workers after the incident aggravated plaintiff's condition, that plaintiff would need medication and support for the rest of his life, and plaintiff would not be able to maintain regular attendance in any employment.
10. Dr. Weinstein suggested that plaintiff change jobs. Plaintiff applied for and secured a position in the nuclear plant section. His duties included cleaning parts. However, plaintiff was unable to concentrate. Employees continued to ask plaintiff about the computer incident. Plaintiff saw Ms. Hughes from a distance in April 2000 and he "felt like all [he] wanted to do was grab her neck and choke her to death." He continued to work until 7 June 2000 but because his condition continued to worsen, plaintiff decided to take an early retirement. He was advised by Donna Dailey in human resources to go out on short-term disability. Plaintiff's application for short-term disability was denied.
11. In July 2000, plaintiff moved to Indian Trail, North Carolina. He secured a job with Lab Corp, but was unable to keep it due to his panic attacks and inability to concentrate. Due to his inability to sleep, plaintiff no longer sleeps with his wife at night.
12. After two years of treatment, Dr. Weinstein placed plaintiff at maximum medical improvement and stated that plaintiff was permanently and totally disabled from all types of employment. Plaintiff testified that he suffers from nightmares and flashbacks concerning the sudden, unexpected allegations of stealing, his abrupt "crisis suspension" and the actions of defendant-employer. Dr. Weinstein noted that plaintiff was also possibly suffering from post-traumatic stress disorder.
13. On 21 August 2002, John F. Warren, III, Ph.D. performed an independent psychological evaluation on plaintiff. Dr. Warren concluded that plaintiff exhibited either malingering or factitious disorder, where a patient presents symptoms to express anger and dissatisfaction. He opined that plaintiff's symptoms were out of proportion to the incident at work.
14. Plaintiff contends that he sustained a mental injury by accident arising out of and in the course of his employment with defendant on or about 26 October 1999. Plaintiff further contends that the meeting with Ms. Hughes, the accusation that he stole computers and his abrupt "crisis suspension" were unexpected and that his suspension resulted from allegations relating to the performance of his job duties. Specifically, plaintiff was accused of stealing and abruptly suspended because some laptop computers that he had helped co-workers pack were missing or stolen. Since plaintiff did not steal the computers, he had no expectation of being accused of stealing and was extremely surprised, upset and humiliated by the accusation and his sudden, unexpected suspension from work.
15. As a result of being unexpectedly accused of stealing and abruptly suspended, plaintiff developed "major depression with obsessions" and possibly post-traumatic stress disorder. Plaintiff's treatment by other employees after he returned to work aggravated his psychological condition. As a result of his major depression with obsessions, plaintiff has been unable to work for defendant-employer or maintain employment in other jobs he has been able to get since 7 June 2000. The Full Commission gives greater weight to the opinions of Dr. Weinstein.
16. The sudden meeting and accusation of stealing and his abrupt suspension were unexpected and not reasonably designed by plaintiff. Plaintiff did not initiate the meeting. Since plaintiff did not steal the computers, he had no expectation of being accused of stealing and was extremely surprised, upset and humiliated by the accusation of stealing, his "crisis suspension" and the treatment he received. Despite these findings of fact, the Full Commission majority previously concluded that plaintiff did not sustain a compensable injury by accident. The Court of Appeals remanded this matter to the Full Commission because the Commission failed to make sufficient findings regarding whether the personnel action leading to plaintiff's injury was the "normal work routine" or part of an "established sequence of operations, "in order for the Court to determine whether plaintiff sustained an injury by accident. The Court disagreed with defendant's contention that a "legitimate personnel action" can never involve the interruption of the work routine, stating, "[w]hether or not a particular action is part of an `established sequence of operations' is a factual matter which must be decided on a case-by-case basis."
17. The Full Commission finds that the personnel action leading to plaintiff's injury was not part of an established sequence of operations. Monroe Phelps, the hourly human resources person for defendant-employer testified that in his opinion a crisis suspension was not warranted under the circumstances or indicated by the company personnel manual. He testified that "crisis suspension" is normally used for incidents where safety is involved, such as fighting. Todd Best, a Facilities Engineer for defendant-employer, testified that he had seen a number of folks around the shipping carton involved, including employees of other contractors and there was no evidence that plaintiff or the other accused workers had stolen any computers. Craig Suggs, a machine operator and hourly employee of defendant-employer testified he was part of the panel that heard plaintiff's appeal. He testified that the appeals panel did not believe discipline was appropriate. Thomas Tanner works in management in defendant-employer's plant in Ohio and was previously Plant Manager in the Wilmington plant. He was on plaintiff's Peer Review Panel. He testified that defendant-employer had no evidence that plaintiff stole anything and there was no evidence plaintiff was a danger to himself or others to constitute a security risk as claimed by Andrea Hughes as justification for the "crisis suspension." Based on the greater weight of the evidence, plaintiff's sudden investigatory, interrogation-style meeting where he was unexpectedly and falsely accused of stealing computers which is a crime and his sudden, unexpected "crisis suspension" were not part of the normal work routine or an established sequence of operations for defendant-employer. The Full Commission gives great weight to the testimony of Monroe Phelps that in his opinion a "crisis suspension" was not warranted under the personnel manual and the testimony of Craig Suggs that the appeals panel did not believe discipline was appropriate in determining that plaintiff's treatment was not part of an established sequence of operations or the regular work routine. Also, in plaintiff's more than 20 years of employment with defendant-employer he had never been subjected to this type of accusation or treatment before. Therefore, even though the Employee Relations Manual allows crisis suspension as a legitimate action that can be taken pending a full investigation of a potential safety violation to protect employees and the integrity of the investigation, the policy as applied to plaintiff and the type of treatment he received was not considered to be an established sequence of operations by the appeals panel or by Mr. Phelps or by plaintiff.
18. Therefore, plaintiff has proven by the greater weight of the evidence that he sustained an injury by accident arising out of and in the course of his employment on October 28, 1999 resulting in major depression with obsession and that his disability since July 10, 2000 is causally related to his injury by accident.
19. Plaintiff's average weekly wage was $832.90, which yields a compensation rate of $555.54.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has proven that he suffered an injury by accident arising out of and in the course of his employment with defendant-employer on October 28, 1999, resulting in major depression with obsession.Jordan v. Central Piedmont Community College, 124 N.C. App. 112 (1996); N.C. Gen. Stat. § 97-2(6).
2. An injury is compensable under the North Carolina Workers' Compensation Act if: (1) it is caused by an "accident;" and (2) the accident arises out of and in the course of employment. N.C. Gen. Stat. § 97-2(6) (2003). "The claimant bears the burden of proving these elements[,]" including the existence of an accident. Smith v.Pinkerton's Sec. and Investigations, 146 N.C. App. 278, 280,552 S.E.2d 682, 684 (2001). An accident under the workers' compensation act has been defined as "`an unlooked for and untoward event which is not expected or designed by the person who suffers the injury,'" and which involves "`the interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences.'" Calderwood v. Charlotte-Mecklenburg Hosp. Auth.,135 N.C. App. 112, 115, 519 S.E.2d 61, 63 (1999). Plaintiff has shown by the greater weight of the evidence that the sudden, unexpected meeting with Ms. Hughes, being unexpectedly and falsely accused of stealing computers and his subsequent "crisis suspension" resulting in the development of his major depression with obsession constituted an injury by accident.
3. As a result of his major depression with obsession, plaintiff became disabled from working with defendant-employer on July 10, 2000. Thereafter, plaintiff attempted to work in a different employment but was unable to continue working due to his psychological condition. Since July 17, 2001 plaintiff has been totally disabled from working in any employment. Plaintiff is entitled to compensation for total disability from July 10, 2000 and continuing. Defendants are entitled to a credit for wages earned by plaintiff in his attempts to return to work. The Full Commission has given greater weight to the opinions of Dr. Weinstein on disability and finds and concludes that plaintiff is totally disabled from all employment under the first prong ofRussell v. Lowes Product Distribution, 108 N.C. App. 762 (1993); N.C. Gen. Stat. §§ 97-2(9); 97-29.
4. Plaintiff is entitled to compensation for all medical treatment received or to be received in the future as a result of his injury by accident.
 * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law the Full Commission enters the following:
 AWARD
1. Subject to a credit for wages earned in plaintiff's attempts to return to work, defendants shall pay to plaintiff total disability compensation at the rate of $555.54 per week from July 10, 2000 and continuing until further order of the Commission.
2. Defendants shall pay all medical expenses incurred or to be incurred in the future by plaintiff for his compensable injury when bills for same are approved according to procedures adopted by the Commission.
3. An attorney's fee of 25% of the compensation due plaintiff herein is approved for plaintiff's counsel, payable as follows: 25% of the accrued compensation due plaintiff herein shall be deducted and paid directly to plaintiff's counsel and thereafter plaintiff's counsel shall receive every fourth check.
4. Defendants shall pay the costs.
This the ___ day of February, 2007.
S/_________________________
 BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_________________________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
 S/_________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER